1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                 FOR THE DISTRICT OF OREGON

11   ELIZABETH BREWER,              )
                                    )
12                  Plaintiff,      )
                                    )     No.  CV-05-6140-HU
13       v.                         )
                                    )
14   JO ANNE B. BARNHART,           )
     Commissioner of Social         )     FINDINGS & RECOMMENDATION
15   Security,                      )
                                    )
16                  Defendant.      )
     ───────────────────────────────)
17
     Kathryn Tassinari
18   DREW L. JOHNSON, P.C.
     1700 Valley River Drive, First Floor
19   Eugene, Oregon 97401

20       Attorney for Plaintiff

21   Karin J. Immergut
     UNITED STATES ATTORNEY
22   District of Oregon
     Neil J. Evans
23   ASSISTANT UNITED STATES ATTORNEY
     1000 S.W. Third Avenue, Suite 600
24   Portland, Oregon 97204-2902

25   Johanna Vanderlee
     SPECIAL ASSISTANT UNITED STATES ATTORNEY
26   Social Security Administration
     701 5th Avenue, Suite 2900 M/S 901
27   Seattle, Washington 98104-7075

28       Attorneys for Defendant

     1 - FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge:

Plaintiff Elizabeth Brewer brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction under 42 U.S.C. §§ 405(g). I recommend that the Commissioner's final decision be affirmed.

PROCEDURAL BACKGROUND

Plaintiff applied for DIB on October 9, 2002, alleging an onset date of September 18, 1997. Tr. 69-73. She was insured for DIB through December 31, 1997. Tr. 79. Her applications were denied initially and on reconsideration. Tr. 47-49, 55-57.

On February 4, 2004, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ). Tr. 491-526. On April 29, 2004, the ALJ found plaintiff not disabled. Tr. 13-30. The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 5-8.

FACTUAL BACKGROUND

Plaintiff alleges disability based on osteoarthritis, rheumatoid arthritis, fibromyalgia, diverticulosis, chronic pain, chronic fatigue, lumbar pain, painful varicosities, dizzy spells, and loss of balance. Tr. 82. At the time of the February 5, 2004 hearing, plaintiff was forty-seven years old. Tr. 495. She has an Associate's Degree in computer systems. Tr. 513. Her past relevant work is as case manager and teacher aide. Tr. 521.

I. Medical Evidence

Plaintiff has had several treating physicians over the years, some overlapping during certain time periods. I recite here the

2 - FINDINGS & RECOMMENDATION

medical evidence relevant to the issues raised in this appeal.[1]

Dr. Marvin Sakakihara of the Permanente Medical Group in Napa, California, was plaintiff's treating physician for a number of years preceding 1995. Tr. 316. In March 1995, he stated in a letter written "To Whom it May Concern," that plaintiff had several chronic medical problems that could affect her work. Id. He cited chronic low back pain, fibromyositis, and painful varicosities and leg symptoms "related to this." Id. He recommended various accommodations such as a chair with good lumbar support and arm support to help her chronic lumbar pain and fibromyalgia. Id. He noted that other accommodations should include wrist supports and foot and leg support. Id. He indicated that he would contact the Occupational Medicine Department for information on designing work spaces for persons with chronic problems such as plaintiff. Id.

In August 1995, Dr. Sakakihara again wrote a "To Whom it May Concern" letter which recited plaintiff's problems as fibromyositis and bilateral greater trochanteric bursitis, along with lumbar pain and painful lower leg varicosities. Tr. 324. He opined that her combination of problems made it difficult for her to sit for long periods of time. Id. According to Dr. Sakakihara, plaintiff reported that she had been able to manage one-day conferences of five or six hours, although that amount of sitting could cause a flare up of her symptoms. Id. He requested that any activities or conferences which required long hours of sitting be limited to one

[1] As noted below, plaintiff contends that the ALJ failed to give clear and convincing reasons for rejecting her testimony and the testimony of a lay witness and further erred by rejecting the opinions of her treating physicians Dr. Marvin Sakakihara and Dr. Kash Siepert, and examining physician Dr. James Morris.

1    day or less.  Id.

2        In May 1997, Dr. Sakakihara wrote plaintiff a letter
3    permanently excusing her from jury duty because of "medical
4    problems."  Tr. 315.  Later that month, he listed approximately one
5    dozen medications to which plaintiff had allergies.  Tr. 325.

6        In December 1996, and then again in July 1997, plaintiff was
7    also seen by two podiatrists with the Permanente Medical Group.
8    Tr. 174, 172, 168.  On December 5, 1996, Dr. Gordon Sinclair,
9    D.P.M., noted her complaint of heel pain and pain along the course
10   of the posterior tibial tendon.  Tr. 174.  He recommended that she
11   get comfortable orthotics, stretch her achilles tendon, and use a
12   removable cast.  Id.  On December 17, 1996, Dr. Mark Kunkel, D.P.M.
13   saw plaintiff to review her orthotics.  Tr. 172.

14       On July 9, 1997, plaintiff saw Dr. Kunkel for a second time
15   and repeated her complaint of heel pain.  Tr. 166.  She asked for,
16   and received, a walker.  Id.  X-rays taken on that date revealed
17   plantar spurs bilaterally, minimally to moderately severe.   Tr.
18   190.  There was adjacent fascial calcification on the left, but not
19   on the right.  Id.  There was also "spurring, dorsum of the left
20   tarsal junction."  Id.

21       Plaintiff moved from California to Oregon sometime between
22   June 15, 1998 (her last record with Permanente Medical Group in
23   Napa), and December 6, 1999, when she started treating with the
24   Valley Medical Group in Roseburg.  On December 6, 1999, plaintiff
25   initially saw Dr. Layne S. Jorgensen, D.O., to establish care.  Tr.
26   403, 397.  Her subjective complaints at that time were a history of
27   fibromyalgia and chronic pain syndrome, history of frequent,
28   recurrent upper respiratory infections, a history of asthma, and a

4 - FINDINGS & RECOMMENDATION

complaint of chronic foot pain.  Tr. 403.

On this December 1999 visit, plaintiff reported taking 10 milligrams of Flexeril at bedtime as needed, for the fibromyalgia, and 10 milligrams of Valium on days when she experienced severe symptoms.  Id.  On physical examination, Dr. Jorgensen noted that plaintiff had tenderness to palpation to the cervical spine and "trigger points noted." Tr. 397.  Dr. Jorgensen did not, however, note the number of trigger points, nor their location.  Id.

Although plaintiff established care with Valley Medical Group in December 1999, and continued as a patient there until at least May 2002, she started treating with Dr. Gary Wheeler, M.D., sometime in 2000.  Tr. 260.  It is unclear exactly when plaintiff began to see Dr. Wheeler.  The first chart note of any significance is dated August 21, 2000, and refers to plaintiff returning to Dr. Wheeler for a follow-up of her fibromyalgia.  Id.  The August 21, 2000 note clearly suggests plaintiff had previously seen Dr. Wheeler, despite the absence of any chart note substantiating such a visit.

In a Patient's Personal History questionnaire completed by plaintiff for Dr. Wheeler, the date of her first appointment is left blank.  Tr. 263.  In response to the questions posed there, however, plaintiff wrote that she did most of the housework and shopping.  Tr. 266.  She described herself as being able to function "OK" most of the time.  Id.  She indicated that she usually has trouble climbing and descending stairs, and usually had problems with sleep.  Id.

In his August 21, 2000 chart note, Dr. Wheeler noted that plaintiff complained of aches and pains all over, from the neck

5 - FINDINGS & RECOMMENDATION

1 down.  Tr. 260.  On neuromuscular examination, he found diffuse
2 trigger point tenderness typical of fibromyalgia without synovitis,
3 thickening, effusion, or subcutaneous nodules.  Id.  He noted that
4 plaintiff had good range of motion in all her joints.  Id.  He
5 stated that the neurologic examination showed "no focal deficits or
6 pathologic reflexes except for a moderate amount of chronic pain
7 behavior."  Id.  He prescribed two milligrams of Xanaflex in place
8 of Flexeril for the fibromyalgia.  Id.

9      In October 2000, even though plaintiff was already a patient
10 of Dr. Wheeler's and Valley Medical Group, she went to Sutherlin
11 Family Medicine as a new patient.  She was initially seen on
12 October 4, 2000.  Tr. 195.  The chart note from that visit is hard
13 to read, but the clinician, who apparently is a Physician's
14 Assistant, appears to have diagnosed her with sinusitus and
15 fibromyalgia, although there is no discernable reference to any
16 kind of trigger point examination.  Id.  At a January 23, 2001
17 visit with D. Daniels, PAC of Sutherlin Family Medicine, plaintiff
18 requested medication to take during exacerbations of her
19 fibromyalgia pain.  Tr. 192.  She also reported at that time,
20 however, that she rarely has to use any thing for such pain, taking
21 something only once or twice per month.  Id.  Daniels prescribed
22 Darovet-N for her to take as needed for pain.  Id.

23      In February 2001, plaintiff was hospitalized for several days
24 for a gastrointestinal illness.  Tr. 196-213.  The chart note
25 summarizing her hospital admission and discharge indicates that she
26 presented to the emergency room complaining of an acute onset of
27 nausea and vomiting which began after she had eaten lunch while
28 volunteering at the mall.  Tr. 198.  Her discharge diagnosis was

6 - FINDINGS & RECOMMENDATION

acute gastroenteritis.  Id.  Irritable bowel syndrome was also noted.  Id.

Although plaintiff initially established care at Valley Medical Group with Dr. Jorgensen, it appears that beginning in March 2001, she regularly saw Dr. Sarah Agsten, D.O. at that practice.  Tr. 396, 404.  Although Dr. Agsten noted plaintiff's history of fibromyalgia, arthritis, and asthma, there is no indication that Dr. Agsten herself performed any trigger point examination.  Tr. 396.  Dr. Agsten made no assessment of fibromyalgia at this time.  Tr. 396, 404.  She noted that plaintiff took Advil for fibromyalgia and reported that she was tired, but was in no acute distress.  Id.

Plaintiff saw Dr. Agsten again in April 2001 and complained of hurting all over and joint pain, ongoing for years.  Tr. 394.  Dr. Agsten noted that plaintiff's recent laboratory test results showed "weakly positive for the rheumatoid factor[.]"  Id.  Plaintiff reported that she had recently started taking Ambien for insomnia and that it "works wonders."  Id.  She reported taking no pain medication at that time for her arthralgia and myalgia.  Id.  Dr. Agsten reported that plaintiff was in no acute distress upon physical examination.  Id.  She assessed plaintiff as having fibromyalgia with a weakly positive rheumatoid factor, asthma, and insomnia.  Id.  She started plaintiff on Celebrex and continued her on Ambien.  Id.

In May 2001, plaintiff was admitted to the hospital for

vomiting blood and a history of hematochezia[2] the previous
February.    Tr. 215.    An endoscopy and abdominal CT scan were
negative.    Tr. 388.    An upper gastrointestinal x-ray series with
small bowel follow-through was also negative.    Id.    A tentative
diagnosis of irritable bowel syndrome was made, although no
medications were started.    Id.    At her May 17, 2001 post-discharge
visit with Dr. Agsten, Dr. Agsten prescribed Vioxx for plaintiff's
arthralgia.    Id.

Plaintiff next saw Dr. Agsten in September 2001 when she
complained about left armpit and left elbow pain, as well as
painful varicose veins, which she reported were becoming enlarged.
Tr. 381.    Dr. Agsten's assessment noted irritable bowel disorder,
recent episode of dizziness possibly related to plaintiff's
allergies, varicose veins in her right lower extremities, and
gastroesophageal reflux.    Id.    No mention was made of plaintiff's
fibromyalgia.    Id.    She recommended warm compresses for the left
armpit pain.    Id.

Plaintiff then saw Dr. Wheeler again in late September 2001.
Tr. 259.    He noted that she returned for follow up of her
fibromyalgia and pain in her left arm.    Id.    He reported that since
she was last seen, she has "done fairly well."    Id.    She had
resumed taking Flexeril.    Id.    She also used occasional Tylenol and
25 milligrams of Vioxx per day.    Id.    He noted that she used an arm
band above and below her elbow.    Id.

Dr. Wheeler's objective examination revealed that plaintiff's

_____

[2]    Hematochezia is the passage of stool containing blood.
Taber's Cyclopedic Med. Dict. 637 (14th ed. 1981)

8 - FINDINGS & RECOMMENDATION

joints showed no evidence of active synovitis, although she had localized tenderness at the lateral epicondyle at the left elbow, and trigger point tenderness across the upper trapezious.  Id.  He found good range of motion of her joints.  Id.  He recommended that she temporarily increase the Vioxx to 50 milligrams per day for three days, then return to the 25 milligrams per day dose.  Id.  He further recommended that she continue to use the arm band below the elbow and if she showed no improvement over the next two weeks, he might consider a local injection.  Id.

Dr. Wheeler next saw plaintiff on November 21, 2001, to follow up on her left elbow pain.  Tr. 259.  He reported that plaintiff continued to be "symptomatic from the fibromyalgia" but he referred to no specific symptoms.  Id.  He again reported, on objective examination, that plaintiff had good range of motion, even though she continued to have trigger point tenderness due to the fibromyalgia.  Id.

On January 9, 2002, Disability Determination Services (DDS) physician Dr. Martin Kehrli, M.D., issued a functional capacity assessment of plaintiff opining that she could occasionally lift twenty pounds, frequently lift ten ponds, stand or walk six hours in an eight-hour day, sit for six hours in an eight-hour day, and that she had unlimited ability to push or pull.  Tr. 244.  Due to her asthma, Dr. Kehrli indicated that plaintiff should avoid all exposure to fumes, odors, dusts, gases, and areas with poor ventilation.  Id.

In February 2002, plaintiff returned to Dr. Wheeler for follow-up of her fibromyalgia.  Tr. 258.  He noted that plaintiff reported continuing wide spread pain at "the left elbow as well as

9 - FINDINGS & RECOMMENDATION

diffusely including the left foot and ankle." Id. Nonetheless, she continued to use only aspirin or Advil for the pain and had "no other constitutional symptoms or symptoms suggestive of active inflammatory synovitis or other neurologic diseases." Id.

On physical neuromuscular examination, Dr. Wheeler remarked that plaintiff continued "to demonstrate a moderate amount chronic pain behavior that is very sensitive even with just range of motion resting at the elbows." Id. He found diffuse tenderness, including tender points in plaintiff's upper back. Id. He found no synovitis, thickening, effusions, or subcutaneous nodules. Id. He also noted that the neurologic exam did not show focal deficits or pathologic reflexes except for an absent right patellar reflex. Id. Dr. Wheeler noted that the "[p]hysical findings are disproportionate to the level of pain[,]" which I understand to suggest that plaintiff's claimed level of pain was not supported by the physical findings. Id.

Plaintiff appears to have changed primary care providers again in May 2002 when she apparently began treating with Dr. Diane Bolduc, M.D. Tr. 379. In her initial visit on May 30, 2002, plaintiff complained of shakiness of her hands several times per day over the last month and told Dr. Bolduc that she had been diagnosed with hypoglycemia at age 13. Id. Dr. Bolduc noted that plaintiff's past medical history included allergic rhinitis, asthma, and a lower GI bleed. Id. There is no mention of fibromyalgia or joint pain. Her noted medications do not include any pain or anti-inflammatory medications.

On physical examination, Dr. Bolduc noted that plaintiff was in no acute distress. Id. She assessed plaintiff as having

10 - FINDINGS & RECOMMENDATION

1  probable reactive hypoglycemia and hyperlipidemia.  Id.

2      On August 22, 2002, DDS physician Linda Jensen, M.D., issued

3  another functional capacity assessment for plaintiff, opining that

4  plaintiff could occasionally lift twenty pounds, frequently lift

5  ten pounds, stand or walk about six hours in an eight-hour day, sit

6  about six hours in an eight-hour day, and that plaintiff had the

7  unlimited ability to push or pull.  Tr. 306.  Dr. Jensen found no

8  other limitations present.  Id.  She concluded that plaintiff had

9  a "light" residual functional capacity.  Id.

10     On September 16, 2002, Dr. Bolduc saw plaintiff to follow up

11 on a complaint of blood in her urine.   Tr. 370.   Although Dr.

12 Bolduc noted fibromyalgia in the "impression" section of her chart

13 note, there is no recitation of any physical examination supporting

14 her diagnosis.  Id.  It appears that plaintiff requested Effexor to

15 take for the condition.  Id.  Dr. Bolduc gave her a prescription

16 for it.  Id.

17     In October 2002, Dr. Sakakihara, who had not been plaintiff's

18 treating physician since she moved to Oregon and who last saw her

19 in August 1997, wrote another "To Whom it May Concern" letter.  Tr.

20 313.  In this letter, Dr. Sakakihara summarized some of the medical

21 problems that plaintiff was experiencing when he was her physician.

22 Id.  He noted that then, she suffered from fibromyalgia which had

23 been officially diagnosed in 1994, although "she had these symptoms

24 for many years."  Id.  He stated that the symptoms associated with

25 plaintiff's fibromyalgia when he saw her included shoulder, upper

26 and lower back pain, hand pain, chronic fatigue, and memory

27 problems.  Id.

28     Next, Dr. Sakakihara noted plaintiff's chronic foot pain,

11 - FINDINGS & RECOMMENDATION

including a left plantar fascia release and left heel spur revision on May 13, 1993. Id. He noted that she continued to have bilateral foot pain. Id. Third, he noted her chronic venous insufficiency, at least since 1988, which caused both lower extremity swelling and leg and foot pain. Id. As a result of these conditions, she suffered from chronic pain and poor balance. Id. Finally, he listed obesity, asthma and chronic sinusitis, chronic sleep disorder, and irritable bowel syndrome as her other medical problems. Id.

Dr. Sakakihara explained that during the last several years before she left his care, plaintiff required a special chair, footrest, and headset at work. Id. He recited that during the latter part of 1996 and through 1997, she was becoming increasingly unable to continue with her work, which at that time was as a case manager for welfare clients. Id. Dr. Sakakihara also noted that at some point during the time when she was his patient, plaintiff required the use of a cane and "Moon" boots. Tr. 314. He concluded that her medical problems led to her inability to continue any full-time work when he last saw her in August 1997. Id.

Plaintiff next saw Dr. Bolduc in November 2002, when she complained of left index finger pain. Tr. 367. An x-ray revealed no acute fracture or dislocation. Id. Plaintiff also reported that she stopped taking Effexor after four weeks. Tr. 364. Dr. Bolduc did not note fibromyalgia in the "impressions" section of this chart note. Id.

During the time plaintiff was under Dr. Bolduc's care, she had a colonoscopy and upper endoscopy performed by gastroenterologist

12 - FINDINGS & RECOMMENDATION

1  Dr. Gerald Engstrom, M.D., on January 8, 2003.  Tr. 334-35.  Dr.
2  Engstrom's assessment was of a history of reflux symptomatology,
3  but with a healthy appearing esophagus, minimal type B gastritis,
4  minimal left colon diverticulosis, and small caliber polyp disease.
5  Id.  Based on the tests, Dr. Engstrom recommended that she take
6  cholestryamine each morning, and Levbid three times per day, plus
7  careful dietary adherence to small meals, no snacking, no late
8  meals, with a high fiber, low fat diet, and a regular exercise
9  regimen.  Id.

10     During 2003, plaintiff continued to see Dr. Bolduc for a
11  variety of complaints.  In January 2003, she saw her to follow-up
12  on Dr. Engstrom's test results.  Tr. 362. At that time, Dr. Bolduc
13  listed   fibromyalgia,   along   with   irritable   bowel   syndrome,
14  hypertryglyceridemia, and obesity as "impressions."  Id.  In May
15  2003, plaintiff complained of muscle spasms "all body," stated that
16  she was sleeping only a  few hours per night, had had no help from
17  Flexeril,  and  wanted  to  try  Zanaflex.   Tr.  357.   Dr.  Bolduc
18  prescribed both Lexapro and Zanaflex.  Id.

19     Within a few months, however, it appears that plaintiff was no
20  longer taking those medications.  Tr. 432.  In an August 28, 2003
21  visit to podiatrist Dr. Kash Siepert, D.P.M., she reported taking
22  Prilosec, Vioxx, Syrtec, Flonase, Pavabid, Ventolin, and Ambien,
23  but not Lexapro or Zanaflex.  Id.  Plaintiff saw Dr. Siepert
24  because  of  bilateral  foot  pain,  mostly  in  her  heel,  and  more
25  intense on the left rather than the right.  Id.

26     Dr.  Siepert's  objective  findings  included  a  moderately
27  pronated  subtalar  joint  of  the  left  heel,  hypermobility  of  the
28  subtalar joint and the midtarsal joint, and significant calcaneal

13 - FINDINGS & RECOMMENDATION

valgus with a flexible forefoot varus. _Id._ X-rays showed a decrease in calcaneal inclination angle which correlated directly with her pronated foot. _Id._ She had spurring on both heels. _Id._ Dr. Siepert also noted plaintiff's generalized pain localized along the plantar fascial tissue, bilaterally, which extended through the entire fascial band in the central band area, as well as the medial calcaneal tubercle areas. _Id._ It was fairly intense on the left and right foot. _Id._

Dr. Siepert assessed plaintiff as having a long-term history of bilateral plantar fasciitis, a history of bilateral calcaneal heel spur syndrome, and a history of bilateral fibromyalgia. _Id._ Dr. Siepert explained that there were no new treatment options for plaintiff. Tr. 433. In discussing pain management, plaintiff reported that Vioxx was quite helpful. _Id._ Dr. Siepert discussed the possibility of a topical treatment. _Id._

Plaintiff saw Dr. Bolduc on September 11, 2003, a couple of weeks after seeing Dr. Siepert, following a urine sample test showing arsenic in her urine, which was taken at an urgent care clinic where plaintiff had gone to complain of persistent spasms in her legs and loss of balance. Tr. 354-55. She also complained about neck and back pain from what she described as being fibromyalgia. _Id._ She requested an evaluation by a pain clinic. _Id._ Although plaintiff did not report taking Lexapro or Zanaflex to Dr. Siepert, Dr. Bolduc noted that she was taking 2 milligrams of Zanaflex without relief, and that she took 10 milligrams of Lexapro each day with partial help. _Id._

Dr. Bolduc assessed plaintiff as suffering from fibromyalgia with chronic symptoms and referred her to a pain clinic for

14 - FINDINGS & RECOMMENDATION

1  evaluation and treatment.  Id.  She also stressed the need to lose
2  weight to help with all of her problems.  Id.

3     As a result of her complaint of loss of balance and memory
4  loss, plaintiff was evaluated by neurologist Dr. Jerry Boggs, M.D.
5  on November 4, 2003.  Tr. 427-29.  As relevant to her fibromyalgia,
6  osteoarthritis, or other joint or muscle disorders, the only
7  medications plaintiff reported to Dr. Boggs were Vioxx and Ambien.
8  Tr. 427.  On physical and neurological examination, Dr. Boggs's
9  only notable finding was that plaintiff walked with a limp because
10 of bilateral foot pain and "orthopedic difficulties" with the left
11 knee.  Tr. 428.

12    Dr. Boggs remarked that the etiology of plaintiff's problems
13 with frequent falls was not the result of a neurologic problem.
14 Id.  There were no objective signs of a myopathy or neuropathy and
15 she was not myelopathic.  Id.  He also found that she performed
16 normally on the mental status examination.  Tr. 429.  He noted that
17 the most common cause of memory loss in plaintiff's age group is
18 underlying mental health issues.  Id.  He prescribed a low dose of
19 Valium for plaintiff's muscle cramps because of plaintiff's stated
20 inability to afford quinine.  Id.  He did not recommend any further
21 neurologic testing at the time.  Id.

22    The last chart note from Dr. Bolduc in the administrative
23 record is dated November 6, 2003.  Tr. 348.  There, Dr. Bolduc
24 noted that plaintiff's fibromyalgia was stable.  Id.

25    On January 19, 2004, Dr. Siepert wrote a letter to DDS
26 regarding plaintiff's limitations.  Tr. 431.  Dr. Siepert first
27 described what plaintiff reported of her medical history and
28 symptoms during her single visit to Dr. Siepert on August 28, 2003.

15 - FINDINGS & RECOMMENDATION

1  Id.  Dr. Siepert then opined that plaintiff was limited in her
2  abilities to stand and walk to no more than 2-3 hours.  Id.  Dr.
3  Siepert found no limitations in sitting and handling objects and
4  noted that plaintiff should be able to hear, speak, and travel
5  well.  Id.  Dr. Siepert further found that plaintiff performed
6  mental activities normally and was able to understand and sustain
7  concentration, as well as socially interact.  Id.  Finally, Dr.
8  Siepert opined that plaintiff could lift objects of five pounds or
9  less.  Id.

10      Plaintiff was examined by pain specialist Dr. James R. Morris,
11  M.D., on January 22, 2004.  Tr. 317-23.  Plaintiff reported to Dr.
12  Morris that she has experienced pain for twenty years, and in the
13  following locations:  neck, both shoulders, both arms, both wrists
14  and hands, abdomen, pelvis, genitals, all areas of the back,
15  buttocks, both hips, both legs, both knees, both feet, and both
16  ankles.  Tr. 317-18.  She described her pain as 7 on a 10 point
17  scale, with 10 being the worst possible pain.  Tr. 318.  She
18  described her worst pain in the previous week as a 10 on that
19  scale.  Id.  Plaintiff told Dr. Morris that she believed the cause
20  of her pain to be fibromyalgia, sleep problems, and foot surgery.
21  Tr. 319.  She reported taking Advil sometimes, twenty-five
22  milligrams of Vioxx once per day, and rarely Phenergan with
23  Codeine.  Id.

24      On physical examination, Dr. Morris found 18 out of 18 tender
25  points positive to approximately four kilograms of pressure.  Tr.
26  320.  Control points test was negative.  Id.  However, although he
27  found tender points present in her shoulders, back, and lower and
28  upper extremities, he also noted that her range of motion in all of

16 - FINDINGS & RECOMMENDATION

those areas was full. Id. He also noted that she had "[s]ome pain behavior." Id.

He diagnosed her as having fibromyalgia and probable osteoarthritis. Tr. 321. He indicated that she was a candidate for multidisciplinary treatment of her chronic intractable pain problem, including physical therapy, psychological evaluation, exercise, nutritional approaches, medical management, and alternative approaches to pain therapy. Id. He noted that her medical problem was complicated by multiple medication sensitivities. Id. He also noted that she might try Lexapro and noted that other drugs may be useful if she could tolerate them. Id. Dr. Morris also noted that various alternative approaches might be useful, including acupuncture, use of a TENS unit, or homeopathy. Id. Finally, Dr. Morris opined that plaintiff's condition was medically disabling and that plaintiff had been completely disabled for five or six years. Id.

II. Plaintiff's Testimony

Plaintiff testified that she had not worked since September 1997 because of increased pain associated with her fibromyalgia and chronic fatigue, and the numerous other medical problems "that go with the FM." Tr. 496-97. She resigned because of chronic pain at work despite the use of "special equipment." Tr. 499. She stated that she suffered from chronic sinus problems, irritable bowel syndrome, and irritable bladder syndrome. Tr. 497. She also noted problems with concentration, sleeping, trouble standing and walking, losing her balance, dropping things, and trouble with vertigo. Id. She stated that although she had been dropping things since 1995, her doctor could not explain it. Id.

17 - FINDINGS & RECOMMENDATION

She remarked on pain in her hips during the hearing, from her buttocks to her knees.  Tr. 497-98.  She also reported back pain, which she described as a combination of a burning with a tearing feeling.  Tr. 498.  She experiences ankle swelling upon sitting too long and has a "bad foot."  Id.  She experiences bad swelling in her right leg and has had problems for years with varicose veins. Id.

Plaintiff testified that she had suffered from fibromyalgia for a long time, but that in 1995, she was sick a lot and it began to get "really bad" at work.  Tr. 500.  The special equipment she used included a foot riser, a computer riser for her monitor, a headset instead of a traditional phone receiver, custom made wrist splints, and an orthopedic chair.  Id.  Nonetheless, she described the pain as continuing.  Id.  At the time, she was taking Flexeril and Valium.  Id.  She missed work because she was tired or sore. Tr. 505.

In addition to the fibromyalgia, plaintiff testified that she had arthritis in her hands, hips, knees, feet, and back.  Tr. 502-03.  Although plaintiff once thought she might be able to work in computers, even with her medical problems, her attempt failed because she cannot type for more than one hour without experiencing discomfort with both sitting and writing.  Tr. 507.  She complained of always being tired and of her chronic "bathroom problems."  Id.

Plaintiff stated that since she left employment in 1997, her symptoms had deteriorated.  Tr. 508.  She stated that she could hardly walk at all, that she was back in her "moon boot" as a result of her foot tendon problem, that she was tired all the time yet slept less than she used to, and that her bladder problem and

18 - FINDINGS & RECOMMENDATION

irritable bowel were also worse.   Tr. 509.

In describing her daily activities at the end of 1997, plaintiff stated that after getting up and having a cup of coffee, she let her dogs out and would start dishes by putting them in the sink.   Id.  She might go get dressed, brush her teeth, and attempt to do something around the house, but she might have to stop.   Id. She would plan dinner, putter around the house, try to pay a bill, and then have lunch with her husband.   Id.  She would try to do something else in the afternoon, or finish something she had started earlier, but in between everything she rested.   Id.  She and her husband would have dinner together, watch television for a couple of hours, then go to bed.   Id.

She did not have any hobbies at that time.  Tr. 510.  She used to read a lot, but stated that she cannot concentrate to finish a book.  Id.  She also used to engage in photography, but stated that she cannot do that any longer because her hands cramp and she drops her camera.  Id.  Because the testimony regarding her inability to concentrate and her hand cramping was phrased in the present tense, meaning at the time of the hearing, it does not appear that plaintiff was suggesting that those impairments existed at the end of 1997.

At the time of the hearing, she was able to do some gardening. Tr. 511.  Her husband built raised beds and she uses a scooter to get around in the garden.  Id.  She has three dogs, three guinea pigs, and two rabbits.  Id.  Plaintiff's husband helps in the care of the animals.  Id.

Plaintiff testified that she would like to work, but could not be considered reliable because she cannot manage to do "three or

19 - FINDINGS & RECOMMENDATION

1   four hours of any type of time." Tr. 511.  She has days when she
2   feels okay and then is "down and out" for two or three days, or
3   even two or three weeks.  Id.  She noted that she has periods of
4   time when she can hardly move off the couch.  Id.  Plaintiff
5   testified that the fluctuating periods of feeling good and bad
6   existed in 1997.  Tr. 512.

7   III.  Lay Witness Testimony

8       Plaintiff's husband Harold Schwesinger testified at the
9   hearing.  Tr. 514.  Schwesinger married plaintiff in September
10  1997.  Tr. 515, 516.  In response to a question asking him to
11  describe the kinds of things plaintiff could do around the house,
12  Schwesinger testified that plaintiff can physically do just about
13  everything, but she cannot do anything for very long.  Tr. 515.  As
14  an example, he noted that it takes plaintiff all day to do the
15  dishes because she experiences muscle cramps and pain.  Id.

16      Schwesinger stated that he does at least half of the
17  housecleaning.  Id.  Although plaintiff washes the dishes, he puts
18  them away.  Id.  He sets the table and puts food away.  Id.  He
19  does half the vacuuming.  Id.  He does all the major dusting.  Id.
20  Although plaintiff is able to get dirty clothes into the washing
21  machine, Schwesinger puts them in the dryer, folds them, and puts
22  them away.  Tr. 515-16.  Plaintiff does most the cooking and
23  Schwesinger accompanies her for any "heavy-duty" shopping.  Tr.
24  516.

25      Schwesinger stated that since they were married, plaintiff has
26  gotten worse although he also noted that there has not been much
27  difference from when they were first married.  Tr. 517.  He
28  mentioned that during their honeymoon, he pushed plaintiff around

20 - FINDINGS & RECOMMENDATION

in a wheelchair, although he did not explain why.  Id.  However, he also testified that shopping was not a problem when they were first married.  Tr. 518.  And, even though plaintiff sometimes would use a wheelchair for activities such as going to a fair, she did not require a wheelchair the first year they went to the fair.  Id. Although, he explained, she was "laid up for weeks after that." Tr. 518-19.  He concluded that all the things that plaintiff experiences now are "just a little worse."  Id.

Schwesinger testified that at the time of the hearing, plaintiff used a cane about half the time.  Tr. 518.  He noted that she experiences flare-ups during which she will use her cane.  Id. Schwesinger concluded his testimony by noting that plaintiff's condition makes planning hard.  Tr. 519.  He gave as an example that plaintiff will often ask him what he wants for dinner and then, when dinnertime comes, "it's fend for yourself night."  Id.

IV.  Vocational Expert Testimony

Vocational Expert (VE) Nancy Bloom testified at the hearing. Tr. 520.  She stated that plaintiff's past relevant work was as a case manager and teacher's aide.  Tr. 521.

The ALJ posed a hypothetical with the following limitations: a forty-seven year old person with a high school education and a college education and past relevant work equivalent to that possessed by plaintiff, who could occasionally lift twenty pounds, frequently lift ten pounds, and who needed to avoid all exposure to fumes, dust, gases, and odors.  Id.  The VE explained that such a person could perform plaintiff's past relevant work.  Id.

The VE further testified that other jobs in the national or regional economy that such a person could perform included small

21 - FINDINGS & RECOMMENDATION

1  products assembler, electronics worker, and laundry folder.  Tr.
2  521-22.

3      The ALJ posed a second hypothetical which included the same
4  education, past relevant work, and limitations, but added the need
5  for the person to rest at least once per day for thirty to sixty
6  minutes and the need to miss three to four days of work per month.
7  Tr. 522.  The VE testified that the additional limitations would
8  preclude employment.  Id.

9  THE ALJ'S DECISION

10      The ALJ first noted that plaintiff was insured for disability
11  benefits only through December 31, 1997, and therefore, to be found
12  eligible for disability benefits, she had to establish that she
13  became unable to work on or before that date, and that such
14  disability has persisted to the present, or lasted for a closed
15  period of at least twelve continuous months.  Tr. 16.

16      The ALJ found that plaintiff had not engaged in substantial
17  gainful activity since her September 18, 1997 alleged onset date.
18  Tr. 18, 29.  The ALJ then determined that plaintiff suffered from
19  severe impairments of asthma, obesity, and fibromyalgia.  Id.
20  However, he found that none of plaintiff's impairments, or
21  combination of impairments, met or equaled a listed impairment.
22  Id.

23      Next, the ALJ determined plaintiff's residual functional
24  capacity (RFC).  Tr. 18.  The ALJ concluded that at all times since
25  the alleged onset date, plaintiff remained able to lift twenty
26  pounds at a time, and up to ten pounds frequently during a normal
27  eight-hour workday.  Tr. 18, 29.  He further concluded that
28  plaintiff could sit and stand for prolonged periods of time with

22 - FINDINGS & RECOMMENDATION

normal breaks and a lunch period.  Id.  He found that she could use her upper and lower extremities for pushing and pulling, and could grasp, turn, and hold objects.  Id.  He determined that she could stoop up to one-third of the time during the average workday.  Id.  He found that she needed to avoid exposure to noxious fumes, dust, odors, and temperature extremes.  Id.

In making this RFC determination, the ALJ noted that the medical record provided little or no substantiation for many of plaintiff's alleged symptoms and impairments, and showed that those with which she may be credited caused far less limitation than she asserted.  Tr. 18.  The ALJ found little contemporaneous medical documentation regarding the specific period for which plaintiff was seeking to establish disability (September 18, 1997, through December 31, 1997).  Tr. 19.

The ALJ concluded that the medical record showed that only obesity, fibromyalgia, and asthma have had more than minimal functional effect on plaintiff for more than twelve continuous months.  Tr. 23.  He explained that the record further shows that plaintiff's documented impairments were adequately addressed in her RFC.  Id.

The ALJ expressly rejected Dr. Siepert's limitations of standing and walking only a few hours per day.  Tr. 24.  In support of the rejection, the ALJ noted that Dr. Siepert had seen plaintiff only once and had accepted plaintiff's subjective history of continuing foot difficulties, which the ALJ found inconsistent with the overall evidence.  Id.  The ALJ further noted that Dr. Siepert did not describe any significant signs and findings beyond plaintiff's subjective reports of pain and tenderness.  Id.

23 - FINDINGS & RECOMMENDATION

1    Although the ALJ accepted plaintiff's diagnosis of
2    fibromyalgia, he determined that her allegations of functional loss
3    were unsupported by signs or findings of impairments which could
4    reasonably be expected to produce her symptoms.  Tr. 24-25.  For
5    example, he noted that her frequent complaint of joint symptoms was
6    at odds with a medical record which continuously found her range of
7    motion intact in all joints with no signs of synovitis.  Tr. 24.
8    (citing medical records of Dr. Wheeler and Dr. Morris).  The ALJ
9    further noted her complaint of frequently dropping things which was
10   inconsistent with a medical record showing no joint abnormalities
11   in her hands, no osteoarthritic or rheumatoid symptoms there, no
12   evidence of any neurologic abnormality, and no evidence of any
13   carpal tunnel syndrome.  Tr. 25.  The ALJ also noted plaintiff's
14   report of a long-standing problem with falls which had no medical
15   explanation and which was not suggested by the medical record to be
16   a long-standing or frequent problem.  Id.

17       The ALJ noted that Dr. Wheeler, who was familiar with
18   plaintiff's diagnoses of fibromyalgia, nonetheless concluded that
19   plaintiff exhibited pain behavior and had a subjective pain level
20   out of proportion to the physical findings.  Id.  The ALJ noted
21   that plaintiff ceased treatment with Dr. Wheeler after he made
22   these statements.  Id.  And, the ALJ noted, when plaintiff saw Dr.
23   Wheeler in September 2001, she reported to him that she had done
24   fairly well since August 2000.  Id.

25       In discounting the functional limitations caused by the
26   fibromyalgia, the ALJ also noted that plaintiff's overall treatment
27   for musculoskeletal pain had not been consistent with severe and
28   disruptive symptoms.  Id.  For example, he noted that she reported

24 - FINDINGS & RECOMMENDATION

experiencing pain on a level of 10 out of 10 yet she did not present to an emergency room for relief as would be expected.   Tr. 25-26.   With pain routinely at a 7 out of 10, the ALJ would have expected to see a record of frequent medical appointments to address her pain complaints.   Id.   Instead, the ALJ noted, her specific follow-up for fibromyalgia symptoms had not been particularly intensive.   Tr. 26.

The ALJ noted that several treating physicians, including Dr. Agsten, Dr. Bolduc, and Dr. Engstrom, repeatedly reported plaintiff as being in no acute distress upon physical examination.   Id.   The ALJ reasoned that the severity of symptoms as alleged by plaintiff could not help but produce acute distress.   Id.   He explained further that even if musculoskeletal complaints were not the focus of treatment at the time, it would be expected that such severe symptoms would be commented on by her examining and treating physicians.   Id.  Rather, he noted, there was barely a comment that plaintiff was uncomfortable and plaintiff's own description of her medical history usually referred only to fibromyalgia as an element, with no indication that it was causing current symptoms (as of the time of her doctor appointments) of whatever extent. Id.

The ALJ expressly discounted Dr. Sakakihara's 2002 opinion that plaintiff could not perform full-time work. Tr. 27.   The ALJ noted that although Dr. Sakakihara had been plaintiff's treating physician at one time, he lacked her subsequent medical history which, according to the ALJ, called into question the reliability of her reports of symptoms.   Id.  The ALJ also explained that many of the impairments cited by Dr. Sakakihara, such as venous

25 - FINDINGS & RECOMMENDATION

insufficiency, were not found to be significant in the following years, while others, such as falls, were not medically documented. Id. Because Dr. Sakakihara was overly dependent on plaintiff's subjective descriptions of symptoms, his disability opinion was not reliable.   Id.

The ALJ also expressly rejected Dr. Morris's opinion that plaintiff had been totally disabled for the five or six years preceding his January 2004 examination, that is, since 1998 or 1999.   Id.   First, the ALJ noted that Dr. Morris rendered his opinion after examining plaintiff only once and had not had the treating relationship which might have allowed him to evaluate plaintiff's subjective symptoms.   Id.   Thus, he accepted plaintiff's report at face value, causing him to make a total disability conclusion after an examination which was negative except for the presence in 2004 of fibromyalgia trigger points. Id.   The ALJ noted that while Dr. Morris does refer to osteoarthritis, neither his examination, nor others in the record show that plaintiff has the disorder.   Id.

The ALJ found Dr. Morris's conclusions to be inconsistent with those of treating physician Dr. Wheeler, and with those of DDS physician Dr. Kehrli.   Id. Because Dr. Morris's conclusion was at odds with the evidence as a whole, and was not supported by appropriate diagnostic findings, the ALJ concluded that Dr. Morris's opinion that plaintiff is impaired to an extent consistent with disability had to be discounted.   Id.   Moreover, the ALJ explained, Dr. Morris's statement that plaintiff was disabled involved a vocational judgment not within Dr. Morris's expertise. Id.

26 - FINDINGS & RECOMMENDATION

1   Based upon his RFC, the ALJ found that plaintiff was able to
2   perform a reduced, but significant, range of light work.  Tr. 27,
3   29.   Based on the VE's testimony, the ALJ determined that
4   plaintiff's RFC was consistent with plaintiff's past relevant work
5   as a case manager or teacher's aide.  Id.  Alternatively, the ALJ
6   determined that plaintiff was able to perform other jobs in the
7   national economy such as small products assembler, electronics
8   worker, and laundry folder.  Tr. 28, 29.  Accordingly, the ALJ
9   determined that plaintiff was not disabled.  Id.

10                 STANDARD OF REVIEW & SEQUENTIAL EVALUATION

11   A claimant is disabled if unable to "engage in any substantial
12   gainful activity by reason of any medically determinable physical
13   or mental impairment which . . . has lasted or can be expected to
14   last for a continuous period of not less than 12 months[.]"   42
15   U.S.C. § 423(d)(1)(A).   Disability claims are evaluated according
16   to a five-step procedure.  Baxter v. Sullivan, 923 F.2d 1391, 1395
17   (9th Cir. 1991).   The claimant bears the burden of proving
18   disability.   Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir.
19   1989).  First, the Commissioner determines whether a claimant is
20   engaged in "substantial gainful activity."  If so, the claimant is
21   not disabled.   Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20
22   C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner
23   determines whether the claimant has a "medically severe impairment
24   or combination of impairments."  Yuckert, 482 U.S. at 140-41; see
25   20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not
26   disabled.

27   In step three, the Commissioner determines whether the
28   impairment meets or equals "one of a number of listed impairments

27 - FINDINGS & RECOMMENDATION

that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; see 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. Yuckert, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, he is not disabled. If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

The court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Baxter, 923 F.2d at 1394. Substantial evidence means "more than a mere scintilla," but "less than a preponderance." Id. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id.

                                DISCUSSION

Plaintiff argues that the ALJ failed to give clear and convincing reasons for rejecting her testimony, that the ALJ erred in rejecting the opinions of Dr. Sakakihara, Dr. Siepert, and Dr. Morris, and that the ALJ erred in his consideration of the lay testimony of plaintiff's husband.

28 - FINDINGS & RECOMMENDATION

I.  Medical Opinions

In social security disability cases, as a general rule, "more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  If the treating physician's opinion is uncontradicted by another physician, it may be rejected only for clear and convincing reasons.  Id.  If the treating physician's opinion is contradicted, it may be rejected for "specific and legitimate reasons" supported by substantial evidence in the record.  Id.  The opinions of examining physicians, those who examine but do not treat, are governed by the same standards.  Id. at 830-31.

Additionally, while "a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." Ukolov v. Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005) (internal quotation omitted).  The same is true for an examining physician's opinion with respect to the ultimate determination of disability.  See 20 C.F.R. § 404.1527(e)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability. . . . A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").

A.  Dr. Sakakihara

Plaintiff contends that the ALJ improperly rejected Dr. Sakakihara's October 13, 2002 letter opining that plaintiff could not work full-time by the end of 1997.  Tr. 313-14.  As noted

1  above, the ALJ explained that at the time Dr. Sakakihara wrote the

2  letter, plaintiff had not been his patient for more than five

3  years, depriving Dr. Sakakihara of the opportunity to assess her

4  credibility over the subsequent years.  The ALJ also noted that

5  several of the alleged impairments noted by Dr. Sakakihara were not

6  significant or were not medically documented.

7       For example, although Dr. Sakakihara opined that plaintiff

8  could not work full-time, the medical records from the time period

9  when he was actually treating her through August 1997, show that in

10 his opinion, she needed certain accommodations to be able to

11 function in her position, and that she should be excused from

12 conferences lasting more than one day and jury duty.  Tr. 315-16,

13 324.  At the relevant time, Dr. Sakakihara indicated that

14 plaintiff's alleged impairments required accommodation, but he did

15 not preclude her from full-time work.  Thus, the record supports

16 the ALJ's conclusion that Dr. Sakakihara's 2002 opinion regarding

17 plaintiff's abilities in 1997 was not supported by the relevant,

18 contemporaneous medical documentation.  The ALJ provided a specific

19 and legitimate basis supported by substantial evidence in the

20 record for discounting Dr. Sakakihara's opinion.  See Weetman v.

21 Sullivan, 877 F.2d 20, 23 (9th Cir. 1989) (ALJ properly rejected

22 treating physician's later-obtained opinion regarding plaintiff's

23 "total disability" when it was inconsistent with medical notes the

24 physician made during examinations conducted during the relevant

25 time period).

26      B.  Dr. Siepert

27      As noted above, Dr. Siepert, the podiatrist, limited plaintiff

28 to lifting five pounds and to walking and standing for only two to

three hours in an eight-hour workday.  As further noted above, the ALJ rejected Dr. Siepert's opinion because Dr. Siepert had seen plaintiff only once and had accepted plaintiff's subjective history of continuing foot difficulties, which the ALJ found inconsistent with the overall evidence, and because Dr. Siepert did not describe any significant signs and findings beyond plaintiff's subjective reports of pain and tenderness.

Plaintiff contends that the ALJ erred in rejecting Dr. Siepert's opinion because although he examined plaintiff only once, there is no reason to question the quality of his examination or the conclusions he reached, and, more importantly, he based his opinion on his examination which revealed numerous objective findings.

Most of the approximately sixteen or more objective findings based on Dr. Siepert's August 2003 physical examination, were unremarkable.  The "non-normal" findings were either based on plaintiff's subjective complaint of pain (e.g. plantar fascial tissue pain, heel pain upon palpation at scar), or do not appear to provide a basis for Dr. Siepert's restrictive limitations on standing and walking or lifting (hypermobility of subtalar and midtarsal joints, apropulsive gait cycle, and a foot which appears to turn out at the heel and turn in at the forefoot (calcaneal valgus with flexible forefoot varus)).

Notably, Dr. Siepert's January 19, 2004 letter gave as the bases for his opinion only plaintiff's history of generalized foot pain of at least ten years and plaintiff's own complaint that she is unable to do any extensive walking or standing without intense pain and discomfort.  Tr. 431.  No objective findings are noted.

31 - FINDINGS & RECOMMENDATION

Since Dr. Siepert did not treat plaintiff other than a one-time visit in August 2003, he has no personal knowledge of her history of foot pain. Thus, his January 2004 opinion is based entirely on plaintiff's own report to him at the August 2003 visit.

Length of the treatment relationship and frequency of the treating practitioner's examination are relevant considerations in determining the weight to be given to a treating physician's opinion. 20 C.F.R. § 404.1527(d). Additionally, an ALJ may reject a treating physician's opinion when it is based on a claimant's subjective reports of pain. Batson v. Commissioner, 359 F.3d 1190, 1194-95 (9th Cir. 2003). Here, the ALJ gave specific and legitimate reasons, supported by substantial evidence in the record, for rejecting Dr. Siepert's opinion.

C. Dr. Morris

Dr. Morris, an examining pain specialist, opined in January 2004 that plaintiff had been "completely disabled" since five or six years ago, meaning since 1998 or 1999. Tr. 317-23. As noted above, the ALJ rejected Dr. Morris's opinion because it was rendered after only a single examination which precluded a full evaluation of plaintiff's subjective symptoms, because of a lack of objective findings other than the presence of fibromyalgia trigger points, because it was inconsistent with the records of treating physician Dr. Wheeler and the opinion of non-examining physician Dr. Kehrli, and because his statement that plaintiff was disabled was a vocational judgment not within Dr. Morris's expertise.

Plaintiff argues that the ALJ erred in rejecting Dr. Morris's opinion because he in fact found 18 out of 18 positive tender

points while control points were negative and thus, he did not rely solely upon plaintiff's reports to him.  Moreover, she argues, his diagnosis of fibromyalgia is consistent with Dr. Wheeler's diagnosis and Dr. Wheeler's noting the presence of trigger points.

Plaintiff confuses the diagnosis of an impairment with the functional loss caused by that impairment.  The ALJ did not reject Dr. Morris's diagnosis of fibromyalgia.  Plaintiff correctly notes that Dr. Morris's diagnosis is consistent with that of treating physician Dr. Wheeler.

What the ALJ rejected, however, was Dr. Morris's opinion that plaintiff had been totally disabled by her impairment for the previous five or six years and it is on this point that the ALJ correctly noted that Dr. Morris relied on plaintiff's subjective reports at face value.  Moreover, as with Dr. Siepert, the ALJ noted that Dr. Morris had examined plaintiff only once.  This fact is a proper consideration in determining the weight given to a medical opinion.  20 C.F.R. § 404.1527.

As the ALJ noted, other than the positive trigger points, Dr. Morris's objective findings were insignificant.  Despite the trigger points, plaintiff still had full range of motion in all upper and lower extremities as well as her shoulders, back, and neck.  Tr. 320.  Her Pain Presentation Inventory administered in Dr. Morris's office was non-diagnostic, with elevations in the non-organic, atypical scales.  Id.  Despite her complaints of 10 out of 10 pain, she generally treated her pain with Advil and Vioxx. Given Dr. Morris's own evaluation and findings, it was not error for the ALJ to conclude that Dr. Morris's examination did not establish complete disability.

33 - FINDINGS & RECOMMENDATION

1    Furthermore, although a fibromyalgia diagnosis may have been

2    consistent with the diagnoses rendered by other physicians,

3    including treating physicians Dr. Wheeler, Dr. Agsten, and Dr.

4    Bolduc, Dr. Morris's "complete disability" conclusion is in

5    conflict with the records and opinions of those physicians. Dr.

6    Wheeler noted several times during the course of treatment that

7    plaintiff had good range of motion and no synovitis. Tr. 258, 259,

8    260.[3]  In August 2000, he opined that plaintiff showed "a moderate

9    amount of chronic pain behavior." Tr. 260.  When he examined her

10   in September 2001, he remarked that she had "done fairly well"

11   since her last visit. Tr. 259.  In February 2002, he again noted

12   that she demonstrated "a moderate amount of chronic pain behavior."

13   Tr. 258. He noted that her "physical findings are disproportionate

14   to the level of pain." Id.

15   Treatment notes from both Dr. Agsten and Dr. Bolduc refer to

16   plaintiff as being in no acute distress, even in the face of

17   plaintiff's subjective reports of pain. E.g., Tr. 379, 393, 394,

18   404; see also Tr. 348 (Dr. Bolduc noted that plaintiff's

19   fibromyalgia was stable).  Thus, the record supports the ALJ's

20   conclusion that Dr. Morris's disability opinion was contradicted by

21   opinions of treating physicians whom plaintiff saw more frequently

22   and over a longer period of time.

23   Last, and significantly, Dr. Morris's opinion of plaintiff's

24

25          [3] Synovitis is "[i]nflammation of a synnovial membrane."

26   Taber's Cyclopedic Med. Dict. 2029 (19th ed. 19997); see also
     Stedman's Online Med. Dict.

27   http://www.stedmans.com/section.cfm/45 (defining synovitis as an
     "[i]nflammation of a synovial membrane, especially that of a

28   joint; in general, when unqualified, the same as arthritis.").

34 - FINDINGS & RECOMMENDATION

1  condition sometime in 1998 or 1999, does not address her condition
2  at the date of alleged onset in September 1997, nor the December
3  31, 1997 date of her last insurance.

4      The ALJ provided specific and legitimate reasons, supported by
5  substantial evidence in the record, for rejecting Dr. Morris's
6  opinion.

7  II.  Plaintiff's Testimony

8      The ALJ is responsible for determining credibility.  Andrews
9  v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  Once a claimant
10 shows an underlying impairment and a causal relationship between
11 the impairment and some level of symptoms, clear and convincing
12 reasons are needed to reject a claimant's testimony if there is no
13 evidence of malingering.  Smolen v. Chater, 80 F.3d 1273, 1281-82
14 (9th Cir. 1996).  When determining the credibility of a plaintiff's
15 complaints of pain, the ALJ may properly consider several factors,
16 including the plaintiff's daily activities, inconsistencies in
17 testimony, effectiveness or adverse side effects of any pain
18 medication, and relevant character evidence.  Orteza v. Shalala, 50
19 F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the
20 ability to perform household chores, the lack of any side effects
21 from prescribed medications, and the unexplained absence of
22 treatment for excessive pain when determining whether a claimant's
23 complaints of pain are exaggerated.  Id.

24     Here, the ALJ concluded that many of plaintiff's allegations
25 of functional loss were not supported by signs or findings which
26 could reasonably be expected to produce her symptoms.  Tr. 25.
27 Although the ALJ may not rely solely on a lack of objective medical
28 evidence to find a claimant not credible, it may be considered

35 - FINDINGS & RECOMMENDATION

1    among other factors in the credibility analysis.    Burch v.
2    Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

3        The ALJ noted that plaintiff's reports of joint pain
4    throughout her body, including pain in her hands, legs, back, and
5    arms, and swelling in her feet, ankles, calves, thighs, and
6    fingers, which she reported as constant, were not supported by the
7    medical record which repeatedly found her joints to be free of
8    positive signs and findings.  Tr. 24.  The ALJ specifically
9    referred to Dr. Wheeler's chart notes finding plaintiff's motion
10   intact in all joints, good range of motion in her joints, and
11   joints free of synovitis.  Tr. 24.  The ALJ also referred to Dr.
12   Morris's report showing good range of motion of all extremities, as
13   well as the neck, shoulders, and back.  Tr. 25.

14       The ALJ also noted that plaintiff's report of dropping items
15   was unsupported by any findings of impairment related to her hands.
16   Id.  Likewise, there was no explanation for her complaints of
17   constant falls.  Id.

18       Given the objective medical evidence, the ALJ did not err in
19   concluding that many of plaintiff's allegations of functional loss
20   were unsupported by signs or findings of impairments which could
21   reasonably be expected to produce symptoms of plaintiff's claimed
22   severity and frequency.

23       As to the fibromyalgia, the ALJ concluded that plaintiff
24   overstated her symptoms.  Id.  Here, the ALJ relied on comments by
25   treating physician Dr. Wheeler to the effect that plaintiff
26   exhibited pain behavior and had pain levels disproportionate to the
27   physical findings.  Id.  The ALJ further noted that her seeking of
28   treatment for fibromyalgia, as opposed to other impairments or

36 - FINDINGS & RECOMMENDATION

diseases, was not particularly compelling and was inconsistent with someone who alleged severe, chronic pain. Tr. 25-26.

The ALJ's conclusion that plaintiff exaggerated the extent of her musculoskeletal pain is supported in the record. Plaintiff's treating physician Dr. Wheeler, whom she saw specifically for treatment of her fibromyalgia, commented on her pain behavior more than once. Tr. 258, 260. Even though he was her primary physician for the treatment of this impairment, she saw him only occasionally, in August 2000, September 2001, November 2001, and February 2002. Tr. 258-60.

In her visits with other primary care physicians, her chief complaint was often not fibromyalgia, but some other illness or impairment. E.g., Tr. 388 (May 17, 2001 visit to Dr. Agsten for follow-up after earlier gastrointestinal disorder hospitalization); 396 (March 22, 2001 visit to Dr. Agsten to establish care and to follow up on February 2001 gastrointestinal-related hospitalization); 394 (April 18, 2001 visit to Dr. Agsten to follow up on lab results); 381 (September 6, 2001 visit to Dr. Agsten to follow up on a previous week's urgent care visit complaining of dizziness); 379 (May 30, 2002 visit to Dr. Bolduc to establish care and complain of hand shakiness); 370 (September 16, 2002 visit to Dr. Bolduc to complain of blood in urine); 367 (November 4, 2002 visit to Dr. Bolduc to complain of left index finger pain); 362 (January 27, 2003 visit to Dr. Bolduc to follow up on Dr. Engstrom's test results). The ALJ accurately recited the evidence and was entitled to draw a conclusion that it did not support plaintiff's complaints of severe and debilitating pain.

Finally, the ALJ noted that plaintiff's subjective testimony

37 - FINDINGS & RECOMMENDATION

was belied by her activities of daily living.  Although the mere fact that a claimant is able to carry on certain activities while complaining of pain, is not, by itself, determinative of a claimant's lack of credibility, <u>Vertigan v. Halter</u>, 260 F.3d 1044, 1050 (9th Cir. 2001), it is still a factor in the overall credibility evaluation.

The ALJ noted that plaintiff continued to assist with chores, including paying bills and shopping.  He noted that she engaged in recreations including reading and watching television, as well as some gardening.  He additionally noted that she went camping. Finally, he mentioned that immediately preceding her February 2001 hospitalization for a gastrointestinal illness, she had been volunteering at the mall.  The evidence supports the ALJ's determination that her activities are "more suggestive of an individual who is limited to light work [rather than] one who has constant severe pain."  Tr. 26.

In summary, the ALJ relied on what he determined were activities of daily living inconsistent with plaintiff's subjective complaints of pain, the fact that the objective medical evidence did not support many of the alleged functional losses, and the determination that plaintiff exaggerated her symptoms related to fibromyalgia, as the bases for rejecting her testimony.  The ALJ cited to specific portions of the record in support of each reason given to discount plaintiff's credibility.  The record supports the ALJ's conclusions.

III.  Lay Testimony

As a lay witness, plaintiff's husband is not competent to testify to medical diagnoses, but is competent to testify as to

38 - FINDINGS & RECOMMENDATION

plaintiff's symptoms or how an impairment affects her ability to work. Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996). The ALJ may disregard a lay witness's testimony by offering reasons germane to the witness. Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).

As noted by the ALJ, Schwesinger stated that plaintiff shopped, visited with others, dined out, gardened, camped, worked on her computer, cooked, did some household chores, and cared for her numerous pets. Tr. 20, 102-09. He also testified that she dropped objects, occasionally needed to use a wheelchair, had difficulty standing, and needed to rest sporadically throughout the day. Tr. 109, 515-16.

The ALJ discounted Schwesinger's testimony for the same reasons that he rejected plaintiff's subjective testimony. Tr. 27. Thus, he relied on conflicts between plaintiff's activities of daily living as described by Schwesinger's and plaintiff's allegations of disabling pain, the lack of objective medical evidence supporting some of plaintiff's complaints, and exaggerations of functional limitations.

If the lay testimony conflicts with medical evidence, the ALJ may reject it. Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005). Here, for the same reasons explained above in connection with the rejection of plaintiff's testimony, the medical evidence does not support many of plaintiff's complaints and thus, the conflict between the medical evidence and plaintiff's subjective testimony not only undermines plaintiff's credibility, it provides a legitimate reason for the ALJ to reject similar lay testimony as well.

39 - FINDINGS & RECOMMENDATION

1    Additionally, if an ALJ may properly reject a claimant's
2  testimony because it is inconsistent with the claimant's daily
3  activities, the ALJ may certainly reject a lay witness's testimony
4  on the same basis, especially when the witness's testimony depends
5  so heavily on the claimant's subjective complaints which have been
6  properly rejected or discounted.  Thus, the ALJ did not err by
7  discounting Schwesinger's testimony based on a conflict between
8  plaintiff's activities as stated by Schwesinger and his description
9  of her functional limitations.

10                              CONCLUSION

11    I recommend that the Commissioner's decision be affirmed and
12 that this case be dismissed.

13                          SCHEDULING ORDER

14    The above Findings and Recommendation will be referred to a
15 United States District Judge for review.  Objections, if any, are
16 due April 4, 2006.  If no objections are filed, review of the
17 Findings and Recommendation will go under advisement on that date.

18    If objections are filed, a response to the objections is due
19 April 18, 2006, and the review of the Findings and Recommendation
20 will go under advisement on that date.

21    IT IS SO ORDERED.

22              Dated this   20th   day of   March      , 2006.

23

24

25                    /s/ Dennis James Hubel
                      Dennis James Hubel
26                    United States Magistrate Judge

27

28

40 - FINDINGS & RECOMMENDATION